The **EXCHANGE AND SAVINGS BANK OF BERLIN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 14790.**

United States District Court
D. Maryland.

June 4, 1965.

See also, D.C., 226 F.Supp. 56.

John S. McDaniel, Jr., Lawrence A. Kaufman, Cable & McDaniel, Baltimore, Md., for plaintiff.

Thomas J. Kenney, Robert W. Kernan, Baltimore, Md., for defendant.

MICHIE, District Judge.

This action was instituted by the Exchange and Savings Bank of Berlin, Maryland, for the recovery of $30,252.47 and interest thereon which the bank paid in income tax and assessed interest for the years 1957, 1958, 1959 and 1960.

The question at issue is whether the taxpayer bank qualifies during those years for exemption from taxation under section 7507(b) of the Internal Revenue Code of 1954.[1]

1. 26 U.S.C. § 7507 (1958); Exemption of solvent banks from tax.

\* \* \* \* \*

"(b) *Segregated assets; earnings.*— Whenever any bank or trust company, a substantial portion of the business of which consists of receiving deposits and making loans and discounts, has been released or discharged from its liability to its depositors for any part of their

The case comes to me on cross motions for summary judgment. There being no real contest as to the facts, they appear as hereinafter set out.

The plaintiff, the Exchange and Savings Bank of Berlin, Maryland, is a presently existing bank which was chartered in 1899 under the laws of Maryland. On February 11, 1932 the bank's affairs and assets were placed in the hands and under the control of the Bank Commissioner of Maryland by the bank's board. Shortly thereafter the Commis-

sioner was named receiver by decree of the Circuit Court for Worcester County, Maryland. On March 19, 1932 a depositor's agreement was entered into between the bank and its depositors[2] under the terms of which the depositors agreed to release the bank from claims for fifty per cent of the deposits then held by the bank and the depositors thereby took in lieu of those claims a lien upon the future earnings of the bank. The balance of the released claims in 1932 was $258,736.03.

claims against it, and such depositors have accepted, in lieu thereof, a lien upon subsequent earnings of such bank or trust company, or claims against assets segregated by such bank or trust company or against assets transferred from it to an individual or corporate trustee or agent, no tax shall be assessed or collected, or paid into the Treasury of the United States, on account of such bank or trust company, such individual or corporate trustee or such agent, which shall diminish the assets thereof which are available for the payment of such depositor claims and which are necessary for the full payment thereof. The term 'agent', as used in this subsection, shall be deemed to include a corporate acting as a liquidating agent."

2. "1. That the undersigned, depositors as aforesaid, do each and all hereby assign, transfer and set over unto the said THE EXCHANGE AND SAVINGS BANK OF BERLIN, MARYLAND, fifty per cent (50%) of all deposits which are now held by said THE EXCHANGE AND SAVINGS BANK OF BERLIN, MARYLAND, for the account of each of the undersigned, but subject to the understanding, however, that such assignment and transfer of said percentage of said deposits is made for the purpose of creating a Reserve Fund for the protection of the solvency of said Bank and in order to at all times maintain such solvency, and said THE EXCHANGE AND SAVINGS BANK OF BERLIN, MARYLAND, is hereby authorized and empowered to use any part or all of said fund to replace any and all losses which it has in the past suffered or which it may in the future suffer, whether on account of losses in investments, depreciation in investments or the uncollectibility of any of its assets or otherwise, hereby releasing and discharging said THE EXCHANGE AND SAVINGS BANK OF

BERLIN, MARYLAND, of and from all liability for the repayment of said Reserve Fund or any part thereof; but it is expressly understood by and between all the parties hereto that in the event that at any time in the future the financial condition of said Bank shall fully and unquestionably warrant the repayment of said Reserve Fund in whole or in part, then and in that event the Board of Directors of said THE EXCHANGE AND SAVINGS BANK OF BERLIN, MARYLAND, by and with the consent of the Bank Commissioner of the State of Maryland, shall repay said depositors ratably and proportionately all or any portion of said Reserve Fund; it is further expressly understood and agreed by and between all parties hereto that from and after the date on which said Bank is reopened interest on said Reserve Fund shall be set aside by said Bank at the rate of three per cent per annum but said interest shall not be paid or credited to the depositors creating said fund until the said fund is released in whole or in part by the authorization of the Board of Directors with the approval of the Bank Commissioner, at which time the accumulated interest shall be paid or credited thereon on such part or parts of the Reserve Fund as may be released or made subject to withdrawal.

"2. The said Reserve Fund shall be considered as a Contingent Fund for the prevention of an impairment of the capital stock of said Bank within the meaning of the Laws of Maryland relating to banking institutions, but, in the event of a merger or future liquidation of said Bank, this fund shall be preferred over capital stock in the distribution of the assets of said Bank, and no dividend shall be paid upon the capital stock until said Reserve Fund shall have been repaid or made subject to withdrawal in full."

Fortunately, the bank survived, prospered, and began repaying depositors under the 1932 agreement. By 1957, the first year in question in this case, the balance due to depositors under the 1932 agreement was $91,878.59. A special reserve account for depositors, set up under the terms of the Depositors' Agreement, contained $79,038.88. In that year the bank requested permission of the Maryland Bank Commissioner to pay five per cent of the unpaid balance of released deposits but the Commissioner, after consulting with the Federal Deposit Insurance Corporation of which the bank is a member, declined such permission and disallowed any payment. The Commissioner refused to allow the payments on the basis of his finding that any such payments would have jeopardized the safety of the bank's current depositors as well as the eventual full repayment of the unpaid claims of depositors under the 1932 agreement. The bank reported net income of $25,284.83 for 1957 and claimed immunity from tax liability under Section 7507(b). Immunity was disallowed and the bank was required to pay a $7,648.11 assessed tax deficiency plus $1,272.00 interest.

In 1958 the bank requested permission from the Bank Commissioner to pay ten per cent of the unpaid balance of released deposits. This permission was granted, conditioned upon the bank improving the condition of its loan portfolio. Payment of $25,491.75 was made, leaving a balance due depositors of $66,386.84. The special reserve account for depositors contained $76,459.77. The bank reported net income of $22,487.60 and paid $6,741.60 in tax.

In 1959 the bank was again permitted to pay only ten per cent of the unpaid balance of released deposits, based upon the findings of the Commissioner, and payment of $25,535.45 was made, leaving a balance of $40,851.39 due depositors. The special reserve account for depositors contained $61,830.30. The bank reported net income of $24,056.49 and paid $7,216.95 in tax.

In 1960 the bank was permitted by the Bank Commissioner to pay another ten per cent of the unpaid balance of released deposits and payment of $25,619.00 was made. leaving a balance due depositors of $15,232.39. The special reserve account for depositors contained $44,174.57. The bank reported net income of $24,827.04 and paid $7,373.81 in tax.

The remaining balance due the depositors was paid in 1961 and no refund claim has been filed for that year.

In summary the facts indicate that during the years 1957 through 1960 the bank was diligent in its efforts to pay the claims of the participants under the depositors' agreement of 1932 as rapidly as the Bank Commissioner would permit. In each of the years in question the Bank Commissioner permitted only those amounts as set out above to be paid to depositors on the basis that, in the Commissioner's opinion, the payment of larger sums would have jeopardized the safety of then current depositors as well as the eventual full repayment of the unpaid claims of depositors under the 1932 agreement. The Bank Commissioner stated that the payment of federal income taxes on earnings for the years 1957 through 1960 reduced by at least the amount of such taxes the payments which the bank would otherwise have been permitted by his office to make to depositors under the 1932 agreement. Under no circumstances would the Commissioner have permitted the bank to disturb or decrease its surplus as shown on its balance sheets for the years 1957 through 1960 in order to make payments on the account of the unpaid claims of depositors under the 1932 agreement. It seems significant that at no time from 1932 through 1960 were any dividends paid to stockholders of the bank.

It seems clear that the original depositors' agreement created an equitable lien on future earnings of the bank, as required by Section 7507(b). See Farmers & Merchants Bank, Ceresco, Neb. v. Commissioner of Internal Revenue, 175 F.2d 846 (8th Cir. 1949). The

second requirement of the statute that payment of taxes diminish the assets which "are available for the payment of (these claims) and necessary for the full payment thereof" presents a difficult question of statutory construction.

■ Both parties, in the briefs and arguments, have given a great deal of consideration to the nature of this statute and whether it is to be given a "strict," a "liberal" or merely a "fair" construction. With all deference to the numerous cited authorities favoring either "strict" or "liberal" constructions of this and related enactments, I shall follow the Court of Appeals of the Sixth Circuit in giving the statute a "fair construction." Bank of Leipsic Co. v. United States, 288 F.2d 467, 470 (6th Cir. 1961). By this I simply mean that the statute should be construed to effectuate the Congress' purpose in enacting it.

Both parties acknowledge that the section was not designed to relieve the banks or their stockholders of their liability for taxes, but rather to protect depositors who have agreed to release their claims from competing claims of the United States for the payment of income taxes out of the bank's earnings. The government defines the question quite properly. Would the payment of taxes in any of the disputed years have diminished the assets which were available for the payment of the depositors' claims and which were necessary for the full payment thereof? In pursuing its analysis, the government relies upon a very simple calculation. When the total surplus from all earnings sources at the end of any tax year exceeds the amount due to the depositors under the agreement, together with the amount of federal taxes otherwise due, the bank's immunity is terminated. According to the government, the financial condition of a bank as measured by banking practice and rules is not the proper criterion for determining when tax immunity should be terminated. On the other hand, the taxpayer relies upon the undisputed finding of the Bank Commissioner that payments to depositors in excess of those made would have jeopardized not only the safety of current depositors but the possibility of eventual full repayment of the old depositors, the people the statute was designed to protect, and therefore argues that the payment of income taxes did diminish the assets available for repayment of the old depositors in each year.

On the record before me, the crucial issue is the relevance of the determination by the Maryland Bank Commissioner. The government has not disputed his determination nor has it presented an alternative analysis of the bank's financial condition which would allow the court to determine (if the court were prepared to substitute its financial judgment for that of the Commissioner) what interests the Commissioner was protecting in making his determination. In this situation, I must accept as fact the determination of the Commissioner that payments in excess of those made should not be permitted, certainly not payments totaling the entire indebtedness, and that, had payments in excess of the amount permitted been made, the interests of the old depositors in full and final repayment would have been endangered.

The authorities are divided upon the question of the relevance of these findings. The Internal Revenue Service has maintained its position, at least since 1941, that they are irrelevant. See G.C.M. 22656, Cum.Bull. 1941–1, 293. This holding was reaffirmed by the Service in Rev.Rul. 60–139, 1960–1 Cum.Bull. 677, and has received encouragement from the courts in two cases involving somewhat similar determinations, De Kalb Trust & Savings Bank v. United States, 253 F.2d 53 (7th Cir. 1958) and Clinton Trust Co. v. United States, 52 F.Supp. 671, 100 Ct.Cl. 348 (1943). The taxpayer relies upon the holding of the Sixth Circuit in United States v. Bank of Leipsic Co., 272 F.2d 341 (6th Cir. 1959), affirming 58–2 U.S.T.C. 9921 (N.D.Ohio 1958) a case virtually indistinguishable from the instant case on

its facts. In my view the Leipsic opinions of the Sixth Circuit and of Judge Kloeb in the district court more nearly comport with the intention of Congress in passing these provisions and should be followed. I pass now to a consideration of these cases.

The Bank of Leipsic in the tax years 1952 through 1954 found itself in very much the same circumstances as did the Exchange & Savings Bank of Berlin some years later. It had entered into a depositor's agreement in the early 1930's which created the necessary lien on future earnings to bring it within the provisions of § 3798 of the Internal Revenue Code of 1939 (now § 7507 of the 1954 Code). In each of the tax years 1952–1954 the bank had a balance sheet surplus sufficient to pay the claims of the old depositors. However, as here, the state banking authorities in conjunction with a representative of the Federal Deposit Insurance Corporation had determined that only small percentages of the total claims should be paid in each year in order to avoid danger to the fiscal structure of the bank. Distinctions do exist, of course. In Leipsic the bank's board of directors which made the original requests of the banking authorities was controlled by the old depositors. This was not the case here. Also the paper balance itself demonstrated a far narrower surplus margin than is apparent in this case. However, the government has chosen not to examine the background of the Commissioner's decision here and rather than speculate in the absence of any qualitative summary of the bank's financial status, I will accept the Commissioner's findings. In each case the government took the straightforward position that the State authorities' findings were irrelevant and that the question of available surplus depended strictly upon an examination of the bank's balance sheet. Judge Kloeb, the District Court in the Leipsic case, noted a very valid criticism of the government's position:

"I think its fault lies in the fact that it is measuring the depositors' claims substantially dollar for dollar with the amount of surplus on hand at any one time, and that just can't be done in banking circles; furthermore, that position does not appear to be contemplated by the statute. If you have an operative bank, you have to have a bank with ample capital, surplus and undivided profits as compared with its total resources to enable it to obtain and retain the confidence of the depositing public."

The Court of Appeals adopted this reasoning in its per curiam affirmance, 272 F.2d 341, supra. In due course the Internal Revenue Service noted its nonacquiescence in Revenue Ruling 60–139 cited supra, stating its objection to the Leipsic decision as follows.

"Under the court's decision, immunity would depend on the judgment of Federal or state bank authorities as to whether the surplus and undivided profits are sufficiently built up to permit payment of the depositor's claims."

However, a careful review of both the Court of Appeals and District Court opinions in Leipsic indicate that this particular criticism is invalid. In its opinion the Court of Appeals implied that the conclusions of the banking authorities could be re-examined where their conclusions were arbitrary or improper or where they had abused their discretion. Judge Kloeb in his opinion accepted an even greater duty to review the banking authorities' determinations. In Leipsic the board of the bank was controlled by the old depositors who in each of the years in question made demands for repayment which the banking authorities found the fiscal structure of the bank could not bear. Judge Kloeb reviewed all of the facts and concluded:

"I think the whole situation indicates that primarily the efforts (of the banking authorities) were on behalf of the depositors, and secondarily on behalf of the bank."

This, taken with other statements in his opinion, I think indicates a proper

willingness to review the bases of these decisions.

At this point it seems useful to review the facts of the instant case. In 1957 the bank requested permission to pay five per cent of the unpaid balance of the released deposits. This request was denied. In 1958 and 1959 requests were made to repay ten per cent of the unpaid balance. The surplus condition was markedly improved in each year. However, in 1958 the payment was allowed only upon the condition that the bank improve its loan portfolio and it was not until 1959 that the bank's request was granted unconditionally. With these facts and their parallel to the Leipsic situation in mind, I think the fallacy in the government's balance sheet test is clear.

The government in arguing for its balance sheet analysis urges that, when the balance sheet surplus exceeds the amount of the old depositors' claims, the failure to end the bank's tax immunity can only accrue to the benefit of the bank. As the bank could, on paper at least, make the old depositors completely whole, it argues that the benefits of the tax immunity cannot thereafter accrue to the old depositors. Or, to put the question in the terms of the statute: how can the payment of the tax decrease the amount of surplus available for the payment of these claims? This analysis gains currency by its simplicity. However, by its use of the blessings of hindsight it virtually guts the statute of any power to aid a functioning bank in repaying these old debts. If we were to examine the records of any of the banks which became viable entities by grace of these reorganizations and were to telescope the tax years and reassess the respective benefit of tax immunity to the bank and to the old depositors, we would find that the entire benefit really accrued to the bank. I would imagine that in virtually all of these cases the fixed dollar claims of the old depositors were repaid eventually and the stockholders of the banks benefited by the exact amounts of the tax immunity. What

Congress granted the old depositors was an immunity to the bank which was to be used by the bank to repay these obligations as rapidly as there was money available to repay it.

The Service argues that because the bank has the paper surplus to pay all obligations ipso facto all future benefit is to the stockholders and the bank. However, that view neglects the practicalities of the situation. The depositors can not get their money the minute that a surplus exists. The state banking authorities have the final say over that matter. In each of these three years they determined not only that there would be no total payment but that the payment of anything more than what was approved would jeopardize the depositors' chances for eventual full repayment and further that imposition of the tax would reduce the amount of each yearly repayment installment by at least the amount of the tax imposed. If the Bank Commissioner acted in good faith and was motivated principally by his concern for the welfare of the depositors, I see no reason why the tax immunity should not be continued.

I will not look back in 1965 to these three years and calculate now who received the benefit of this extension of immunity. From what appears of the history of this bank, I am sure that the stockholders were the real beneficiaries of all immunity from the enactment of this statute. The depositors all had fixed dollar claims which have all been repaid. The immunity, translated into dollars and cents all accrued to the bank. However, the immunity throughout speeded the payment of these claims as it would have in these three years had it been allowed.

The government's analysis seems devoid of any meaningful relevance to Congress' intention to speed repayment. The first year in which there is a sufficient balance sheet surplus to allow repayment has no real significance in terms of the overall picture of financial progress for the institution upon which Con-

gress surely realized eventual repayment of these favored depositors depended. I here find that delay in complete repayment was the result of the necessities of banking practice and was designed to effectuate the speediest and surest possible complete repayment of these old depositors and that therefore the taxpayer bank was within the immunity which Congress intended when it enacted § 7507(b).

There is nothing in the opinions in De Kalb Trust & Savings Bank v. United States, supra, or Clinton Trust Co. v. United States, supra, which dissuades me from this view. In De Kalb, the court found as a fact that there was no lien created by the depositors' agreement there to bring it within the terms of our statute and further that had taxes not been assessed and paid the monies would still not have been paid to the depositors. The facts now before me indicate clearly that a lien on future earnings existed here and that the amounts paid in taxes by the bank would have been paid directly to the depositors in each of the three years 1957 to 1959.

The Clinton Trust Co. case is also distinguishable in that the percentage of the bank's earnings upon which the old depositors had a lien was so small that the court there concluded that the owners would be benefited temporarily more from the application of the statute than the depositors. In the instant case the temporary benefit is all to the depositors. Furthermore, there is nothing contained in the statements of the court in this case or in the De Kalb case with which I am not in substantial agreement. I will construe the statute as strictly as seems to comport with Congress' intention in enacting it and I agree that it was intended for the benefit of the depositors and not for the benefit of the bank.

The tax year 1960 presents a somewhat different problem, however, from any of the three years preceding it. If, as I have held, federal taxes were not properly assessable in the tax years 1957 through 1959, additional payments to the depositors, by the taxpayer's own admission, should have totaled the amount of the tax assessed and paid. The total figure for those three years is $22,878.66, a sum sufficient to repay substantially all of the bank's obligations to the old depositors in 1960 as well as the income tax upon the bank's earnings. It appears from these facts alone that the bank cannot prevail for the tax year 1960 regardless of the findings of the Bank Commissioner in that year. Any other decision would result in a windfall to the bank without having speeded the repayment of the old depositors. The government's motion for summary judgment as to the tax year 1960 must therefore be granted while its motions for the years 1957–1959 will be denied. Summary judgment for the plaintiff will be granted for those years.